UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

BERNADETTE GARRETT-MCCANTS,       )
                                  )
          Plaintiff,              )
                                  )
vs.                               )       CV96-8-1595-NE
                                  )
COLSA CORPORATION,                )
JOSE A. COLLAZO,                  )
                                  )
          Defendants.             )

                    MEMORANDUM OPINION

     This action is before the court on defendants' motion for

summary judgment.

     Plaintiff, Bernadette Garrett-McCants, brings both federal and

pendent state law claims against defendants Colsa Corporation (her

former employer) and Jose A. Collazo (her former supervisor at

Colsa).  Defendant Collazo is "sued in his individual capacity to

the extent allowed by law."  (Amended Complaint, ¶ 7.)

     Plaintiff alleges defendants subjected her to unlawful

discrimination because of an alleged disability (spina bifida

occulta) in violation of the Americans with Disabilities Act of

1990, 42 U.S.C. §§ 12101 et seq.  Plaintiff also asserts she was

subjected to "sexual harassment and sex discrimination" and

retaliation in violation of Title VII of the Civil Rights Act of

1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§

2000e et seq.  Finally, plaintiff pled pendent state law claims

against both defendants for invasion of privacy and outrage, and

against Colsa Corporation ("Colsa") for "negligent and/or wanton

training, supervision, and retention."  Upon consideration of the

28

pleadings, briefs, and motion, this court determines defendants' motion is due to be granted, and all claims dismissed.

## I.  STATEMENT OF FACTS

### A.  Plaintiff's Disability

Plaintiff alleges that Dr. Chi-Tsou Huang of the Spain Rehabilitation Center in Birmingham, Alabama, diagnosed her as having spina bifida occulta almost a decade ago.  (Plaintiff's Deposition, at 21-22.)  Spina bifida occulta is defined as "a thorn like process or projection ... in which there is a defect of the vertebral canal without protrusion of the cord or meninges." *Dorland's Illustrated Medical Dictionary*, at 1557 (28th ed.)  Yet, Dr. Huang did not diagnose such a condition.  Rather, he pronounced plaintiff as suffering from "chronic low back pain."  (Huang Deposition, at 15.)  Dr. Huang testified that such condition is

> very common.  More than fifty percent of normal people
> have pain in [their] low back at one time or another.
> I've got my back pain, too, sometimes.

(Huang Deposition, at 15.)

Dr. Huang never imposed any "specific limitations," or restrictions upon plaintiff's activities:  his recollection is, "I told her to be as active as possible."  (*Id.*, 60.)  Dr. Huang instructed the physical therapists at Spain Rehabilitation Center to show plaintiff how to correctly lift heavy objects, and to give her "[l]ow back exercises to keep range of motion of the joints." (*Id.*, 53.)  Also, Dr. Huang generally instructs all of his patients not to lift objects that weigh in excess of 25 pounds.  (*Id.*, 53.)

2

Dr. Huang saw plaintiff once in 1988, once in 1990, twice in 1991, on June 28, 1995, and finally on July 6, 1995. He never changed his diagnosis of "chronic low back pain," and states there was no "significant change" in plaintiff's condition from 1988 to 1995. (Huang Deposition, at 34-35.) Although Dr. Huang treated plaintiff intermittently for seven years, he did not have any reason to believe she suffered from spina bifida occulta, until he received a letter from Dr. Laura Schlagel, dated September 6, 1995, describing plaintiff as "a 34 year old ... woman with a history of spina bifida occulta." (Exhibit attached to Dr. Huang Deposition.) However, Dr. Huang's opinion was not affected by that letter (id., 37), and plaintiff has not presented any medical records to support Dr. Schlagel's conclusory statement.

## B. Plaintiff's Employment with Colsa

Colsa provides computer software sales, service, and training to government contractors and the private sector. Its operation is based in Huntsville, Alabama. Plaintiff was hired by Colsa for the position of Systems Analyst II on May 11, 1992. In January of 1993, plaintiff was promoted to the position of Manager II. She was one member of a "sales team" (along with Judith Shaver, Lisa Miller, and Scott McCaren) responsible for sales, training, and service. The team applied a group management approach: "it was never a one person decision process." (Shaver Deposition, at 18.)

Defendant Jose Collazo was supervisor of that sales team. Collazo was aware that plaintiff had back problems, because "[t]here were times when she had worn tennis shoes and times when

she said her back's out." (Collazo Deposition, at 31-32.)  Collazo also approved the purchase of an orthopedic chair for plaintiff on July 17, 1995.  (*Id.*, 88.)

### C.   "Focal Point" Position

In August of 1995, Collazo's sales team was lagging in its performance.  Collazo determined that increased accountability within the team was needed.  To that end, he decided to make one member of the team "a point of contact or a focal point for the sales group."  (Shaver Deposition, at 16.)  Collazo chose Judith Shaver as the "focal point," and she became responsible for reporting sales activity, maintaining priority of organization within the team, and distributing and collecting time cards.  (*Id.*, 17.)  Collazo allegedly told plaintiff he did not consider her for the position because "it was going to be a very stressful position and due to my health problems he didn't want to kill me."  (Maples Deposition Exhibit 13:   September 25, 1995 memorandum from plaintiff to Colsa Human Resources Director Diane Maples.)

### D.   Lahey Software Seminar

In the Summer of 1995, Colsa added a new manufacturing computer software program called "Lahey" to its portfolio.  The sales team determined plaintiff should be the focal point for the Lahey software, based on her background in accounting and "the way that she had in the past proven herself to be self-taught." (Shaver Deposition, at 18.)

A training seminar on the "Lahey" software was scheduled to be held San Francisco, California from September 18th to the 21st.

4

During a sales meeting in early August, Judith Shaver recommended that plaintiff attend the seminar. Shaver also voiced her recommendation to Collazo, but he was hesitant to agree, because of the expense of the trip, and because plaintiff "had proven in the past that she could learn this application without the training." (Shaver Deposition, at 27.) Collazo initially decided against sending plaintiff to the seminar. Although Collazo says he was generally concerned about plaintiff's back problem, he claims plaintiff's physical condition was not a determinative consideration in his decision. (Collazo Deposition, at 45.)

Shaver reported Collazo's decision to the sales team. Lisa Miller, a member of the team, claims Shaver told the group Collazo was not going to send plaintiff to the seminar "because of her health." (Miller Deposition, at 53-54.) Plaintiff objected, saying she was physically capable of attending the seminar. After the meeting, Shaver asked plaintiff if she was certain she wanted to attend the conference. Plaintiff responded:

> I've traveled before; I've traveled before coming here; I've traveled since I've been here; there's nothing in my physical limitations that prohibit[s] me from traveling.

(Plaintiff's Deposition, at 68.) After that conversation, plaintiff asked Lisa Miller some questions about her "employment status and the ADA" (Miller Deposition, at 54), because Miller holds a masters degree in human resource management, and, previously worked in that field for several years. (Id., 53.) Miller referred plaintiff to Melissa Musgrove at the Huntsville Rehabilitation Center. Musgrove recommended that plaintiff let it

5

be clearly known what her physical limitations were. To that end, on August 28, 1995, plaintiff presented Shaver with the following written list of self-imposed physical limitations:

> No lifting, No strenuous physical labor, No standing on concrete slab floor for prolonged periods of time, and when I'm hurting take short walks every two hours.

(Maples Deposition, Exhibit 13, Memorandum from plaintiff to Human Resource Director Diane Maples, at 2.) Plaintiff then told Shaver "I am not a laborer and I am paid to think and there is nothing wrong with my brain." (*Id.*)

Collazo claims he did not make a final decision about the seminar trip at the time Shaver first approached him with the suggestion; instead, he claims he only took the matter under consideration. A few days after Shaver and Collazo first discussed the issue, Shaver followed up with Collazo. She told him that the sales group and plaintiff all felt very strongly that someone should attend the training session.

Collazo therefore decided to meet with plaintiff on the matter. (Shaver Deposition, at 35.) He visited plaintiff in her office on September 5, 1995. She claims Collazo told her that "as a friend, he was very concerned about my health. But as a businessman, he had to apply his money [and] resources to where he thought he'd get the greatest return." (Plaintiff's Deposition, at 89.) Collazo attempted to illustrate his point through use of the following, bizarre analogy:

> [I]magine that you were dating this babe and she was hot. You got married and she contracted a venereal disease, and you all couldn't have sex for a year. ... [T]hen

6

you're faced with a dilemma of whether you fulfill your marital obligations and stand by her or do you leave.

(*Id.*, 90.)  As Collazo left plaintiff's office, he told her "as a businessman, he didn't think this was a good decision, but his gut instincts told him he needed to let me go." (*Id.*, 91.)  Collazo then directed plaintiff to contact Sterling Travel Agency, to arrange for a discount airline ticket.

### **E.  Collazo's Inappropriate Comments**

Plaintiff alleges that when Collazo made the "venereal disease analogy," "all of the other inappropriate comments that ... Collazo had made to me over the years came back into my mind and I felt that my job was threatened because of those comments, as well as the comment that he had just made to me." (Plaintiff's Affidavit, at 2.)  Plaintiff alleges that on one, previous occasion, Collazo complimented the appearance of her legs.  (Plaintiff's Deposition, at 95.)  She also claims the following about Collazo:

> He had made a comment once.  I hadn't been working with him long.  We had a meeting one morning, and we were in the hall, and I said, where are we meeting?  And he said, jokingly, the only place I want to meet you is in a dark room with a bottle of wine.

(*Id.*)  Plaintiff claims she and Collazo were passing in the hall when that comment was made, and she "just blew it off." (*Id.*, 96.)  Plaintiff also alleges that Collazo once made the comment:  "You know how I handle women." (*Id.*, 93.)  Although plaintiff is unclear what Collazo meant, she "thought that was inappropriate.

7

You shouldn't handle women any different than anybody else, but I
left it alone." *(Id.*, 94.)[1]

**F.   Colsa's Personnel Policy on Sexual Harassment**

Colsa's sexual harassment policy provides that "all employees
should be able to enjoy a work environment free from all forms of
sexual harassment." (Maples Deposition:   Exhibit 18.)   To that
end, the published personnel policy prohibits the following
specific conduct:

> offensive sexual flirtation(s), advances, or prop-
> ositions; continued or repeated verbal abuse of a sexual
> nature; graphic or degrading verbal comments about an
> individual or his or her appearance; the display of
> sexually suggestive objects or pictures; or any offensive
> or abusive physical contact.

An employee who believes that he or she has been subjected to such
harassment is required to submit a written complaint to the
Associate Director of Human Resources, Dianne Maples, before an
investigation will be undertaken.

**G.   Plaintiff's Sexual Harassment Complaint & Resignation**

On September 18, 1995, plaintiff complained to Maples about
Collazo's conduct.   After listening to plaintiff's story, Maples
responded that Collazo's alleged comments and actions appeared to
be "inappropriate." (Maples Deposition, at 50.)   Maples told
plaintiff "that certainly her complaint was serious and I took it
serious[ly], and once I got her [written statement of] facts that
I would proceed with my investigation." *(Id.*, 52.)   To that end,

---

[1] During her deposition, plaintiff related what "other women" in the office
said about Collazo's interaction with women. (Plaintiff's Deposition, at 96.)
That testimony constitutes inadmissable hearsay, and will not be considered by
the court.

8

Maples requested that plaintiff put her complaint in writing to begin the investigatory process. (*Id.*, 50.) Plaintiff left for the Lahey software seminar that same day, however, and did not draft a written complaint before departing. Plaintiff returned from the seminar on September 21, 1995, but did not file a written complaint with Maples until September 25, 1995. On that same day, plaintiff also submitted a letter of resignation to the human resources department:

> To whom it may concern;
>
> Due to a series of recent events that Human Resources is aware of, my resignation is effective as of September 29, 1995. In my 3 ½ years of COLSA Corporation employment, I've experienced both joy and sadness. I regret that the reason for my leaving is a sad one.

(Maples Deposition, Exhibit 9.)

### H.   Plaintiff Leaves Colsa

Plaintiff left Colsa on September 29, 1995, and soon thereafter began working in a similar position at Computer Science Corporation ("CSC"). In the employment application plaintiff submitted to CSC on August 30, 1995, she answered "No" to the following question, presented under the heading "Physical Accommodations":

> Do you have any physical condition or handicap that may limit your ability to perform the job for which your are applying or which may endanger the health or safety of others?

(Attachment to Affidavit of Eve M. Wiltse: plaintiff's employment application.) Plaintiff also completed a "Personal Data" information sheet for CSC, in which she indicated she did not have a handicap. (*Id.*)

## I.   Colsa's Investigation

Maples began her investigation by contacting Gary Rigney, Colsa's legal counsel.  She did so because she thought "some of the information in the complaint could possibly lead to a legal problem."  (Id., 58.)  Two days after plaintiff filed her complaint, on September 27, 1995, Maples and Rigney interviewed Collazo, and confronted him about plaintiff's allegations.  They asked Collazo about circumstances surrounding the promotion of Judith Shaver, the venereal disease analogy, and the Lahey seminar.  Collazo claimed he chose Judith Shaver for the promotion because it was "the best decision based on the objectives that need to be accomplished this year for the sales group." (Maples Deposition: Exhibit 4.)  Collazo admitted using an analogy that involved a woman with a "gynecological problem," but denied any wrong doing.  Also, he claimed that when he initially refused to allow plaintiff to travel to the Lahey seminar, he was "looking out for Bernadette's best interest in being concerned about her health as she had a recent flair up of her back pain." (Id.)  Over the next week, Maples interviewed several of plaintiff's co-workers, including Judith Shaver, Ken Riley, and Susan Bobo.  She did so, even though plaintiff already had departed Colsa for her new job at CSC.  None of the employees interviewed knew of any discriminatory practices by Collazo.  Maples ended her investigation on October 5, 1995, and issued a memorandum to Collazo, summarizing her findings as follows:

> [A]lthough the conclusion was that you had not violated any law, a disciplinary action is in order based on some

> inappropriate conversation/statements you had admitted
> making to Bernadette, in particular the analogy.    I
> believe that you did not intend to offend Bernadette,
> however, we need to make sure that no future actions of
> this type occur.

(Maples Deposition, Exhibit 24, Disciplinary Counseling Report.)

On October 30, 1995, Clarence Tidwell, president of Colsa, adopted

Maples' recommendation, and issued a "Disciplinary Counseling

Report." The disciplinary report required Collazo to "refrain from

making any statement/analogy of a sexual nature to a female

employee," and to attend a management training seminar that dealt

specifically with issues in employment law. (Id.) Collazo signed

the report, and a copy was placed in his personnel file.  (Id.)

Collazo attended a seminar entitled "Issues in Employment Law

Training" in December of 1995.

## II.  AMERICANS WITH DISABILITIES ACT CLAIMS

Plaintiff alleges defendants "maliciously refused to promote

Plaintiff, denied her necessary training, made and/or condoned

offensive statements to Plaintiff, [and] constructively discharged

her" in violation of the Americans with Disabilities Act.  (Amended

Complaint, ¶ 25.)  Congress enacted the ADA in 1990 for the stated

purpose of providing "a clear and comprehensive national mandate

for the elimination of discrimination against individuals with

disabilities." 42 U.S.C. § 12101(b)(1).  Title I of the Act, which

applies to private sector employers, provides that

> [n]o covered entity shall discriminate against a
> qualified individual with a disability because of the
> disability of such individual in regard to job
> application procedures, the hiring, advancement, or
> discharge of employees, employee compensation, job

11

training, and other terms, conditions, and privileges of
employment.

*Id.*, § 12112(a). The statute further imposes an affirmative duty
upon employers to provide reasonable accommodations for disabled
individuals. In ADA parlance, the word "discriminate" is defined
broadly to include

> not making reasonable accommodations to the known
> physical or mental limitations of an otherwise qualified
> individual with a disability who is an applicant or
> employee, unless such covered entity can demonstrate that
> the accommodation would impose an undue hardship on the
> operation of the business.

*Id.*, § 12112(b)(5)(A).

Plaintiff bears the burden of proving, by a preponderance of
the evidence, that defendants intentionally discriminated against
her, because of her disability. That can be done either by direct
or circumstantial evidence. When plaintiff's evidence is
circumstantial in nature, however, the Supreme Court has developed
a three stage framework for focusing the inquiry. *See McDonnell
Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668
(1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S.
248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981); *St.
Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125
L.Ed.2d 407 (1993).[2]

---

[2] Although the Eleventh Circuit has not explicitly held so, it is widely
agreed that the burden-shifting analysis expressed in McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and applied in Title
VII cases is similarly followed in deciding cases brought under the ADA. *See*
Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996), *cert.
denied*, __ U.S. __, 117 S.Ct. 964 (1997)(implicitly using burden-shifting
framework); McNemar v. The Disney Store, Inc., 91 F.3d 610, 619 (3d Cir. 1996),
*cert. denied*, __ U.S. __, 117 S.Ct. 958 (1997); Rizzo v. Children's World
Learning Centers, Inc., 84 F.3d 758, 761 n.2 (5th Cir. 1996), *cert. denied*, __

12

First, plaintiff must establish a *prima facie* case, which, under the ADA, requires proof that: (1) plaintiff is an individual with a disability;[3] (2) she is a "qualified" individual (i.e., that she can, with or without reasonable accommodation, perform the essential functions of the employment position she holds or seeks); and (3) she was subjected to discrimination because of her disability. *Gordon v. E. L. Hamm & Associates, Inc.,* 100 F.3d 907, 910 (11th Cir. 1996)(citing *Pritchard v. Southern Company Services,* 92 F.3d 1130, 1132 (11th Cir. 1996), and *Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir. 1996)). "In addition, a plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled." *Gordon,* 100 F.3d at 910.

If plaintiff establishes a *prima facie* case, then at the second stage of analysis the burden of production shifts to defendants to rebut the presumption of intentional discrimination by articulating legitimate, nondiscriminatory reasons for the contested employment action. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. If defendants do so, then in the final step of the inquiry plaintiff must have an opportunity to show by a

_____

U.S. ___, 117 S.Ct. 958 (1997); *see also* Johnson v. Boardman Petroleum, Inc. 923 F. Supp. 1563 (S.D. Ga. 1996); Lewis v. Zilog, Inc., 908 F. Supp. 931 (N.D. Ga. 1995).

[3] The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment, but rather on the effect of that impairment on the life of the individual. 29 C.F.R. § 1630.2(j)(App.).

13

preponderance of the evidence that defendants' stated reasons merely are pretexts for unlawful, discriminatory motives. *Id*.

## A.    Individual Capacity ADA claims

The Eleventh Circuit holds "the Americans with Disabilities Act ... does not provide for individual liability, only for employer liability." *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996). Although the statute does include "any agent of such person" within the statutory definition of "employer," the Eleventh Circuit has held "that the 'agent' language was included to ensure *respondeat superior* liability of the employer for the acts of its agents...." *Id*.    Therefore, plaintiff's ADA claims against defendant Jose A. Collazo are due to be dismissed.

## B.    Plaintiff's Prima Facie Case

### 1.    Does plaintiff have a "disability"?

Under the ADA, "disability" is defined as: (a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(emphasis supplied).

> While the ADA defines neither "major life activities" nor "substantially limits," courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") for guidance. *See* 42 U.S.C. § 12116 (requiring the EEOC to issue regulations to implement Title I of the ADA); *Dutcher [v. Ingalls Shipbuilding*,] 53 F.3d [723,] 726 [(5th Cir. 1995)]. The ADA regulations adopt the definition of "major life activities" found in the Rehabilitation Act regulations. *See* 34 C.F.R. § 104. This term is defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). In this regard, the EEOC has provided that courts should consider the

14

> following three factors when determining whether an
> impairment substantially limits a major life activity:
> (1) the nature and severity of the impairment; (2) the
> duration or expected duration of the impairment; and (3)
> the permanent or long term impact, or the expected
> permanent or long term impact of or resulting from the
> impairment. 29 C.F.R. § 1630.2(j)(2); *Dutcher*, 53 F.3d
> at 726; *Bolton v. Scrivner, Inc.*, 36 F.3d 939 (10th Cir.
> 1994), *cert. denied*, ___ U.S. ___, 115 S.Ct. 1104, 130
> L.Ed.2d 1071 (1995).

*Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th

Cir. 1996).

### (a) A physical impairment that substantially limits a major life activity

Plaintiff has presented no evidence showing that she is

substantially limited in her ability to walk, see, hear, speak,

breath, or learn. Thus, plaintiff must prove that her back

condition substantially limits her ability to work.

Plaintiff relies on the testimony of Dr. Huang to establish

she has a disability. Yet, as previously discussed, Dr. Huang

merely diagnosed plaintiff as having "chronic low back pain": a

"very common" condition; "[m]ore than fifty percent of normal people

have pain in [their] low back at one time or another." (Huang

Deposition, at 15.) In addition, plaintiff answered "No" to the

following question on her August 30, 1995 application for

employment with CSC in a position similar to the one she held at

Colsa:

> Do you have any physical condition or handicap that may
> limit your ability to perform the job for which your are
> applying ...?

(Attachment to Affidavit of Eve M. Wiltse: plaintiff's employment

application.) Thus, the undisputed evidence shows plaintiff does

15

not have a physical impairment that substantially limits one or more of her major life activities.

### (b)  A record of such impairment

"Has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k); see also Ellison v. Software Spectrum, Inc., 85 F.3d 187, 192 (5th Cir. 1996).  Plaintiff's personnel file includes a July 17, 1995 purchase order for an orthopedic chair.  That alone, however, is insufficient to establish that Colsa has classified or misclassified her as having a physical impairment that substantially limits one or more of her major life activities.

### (c)  Regarded as having such an impairment

The Eleventh Circuit defines one who is "regarded as having such an impairment" as:

> an individual who (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by her employer as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has no illness or malady defined by the EEOC as a physical or mental impairment but is treated by her employer as having a substantially limiting impairment.

Gordon, 100 F.3d at 912-13 (citing 29 C.F.R. § 1630.2(l)).

The evidence shows defendants perceived plaintiff's back pain as limiting her physical ability in two respects: (1) defendants regarded her as being unable to travel by plane to a seminar in San Francisco; and (2) defendants regarded her as being unable to perform the additional tasks given to the sales team member

16

designated as the "focal point" of the group. The first misconceived limitation placed on plaintiff (i.e., the seminar trip) was cured, however. Plaintiff informed defendants:

> I've traveled before; I've traveled before coming here; I've traveled since I've been here; there's nothing in my physical limitations that prohibit[s] me from traveling.

(Plaintiff's Deposition, at 68.) Once plaintiff clarified her situation, she was allowed to attend the seminar. Thus, defendants did not foreclose that opportunity to her.

The "focal point" position was held by a member of the sales team, but additional duties were given to that person. Judith Shaver described the additional responsibilities of her "focal point" position as: reporting sales activity; maintaining priority of organization within the sales team; and distributing and collecting time cards. (Shaver Deposition, at 17.) Thus, plaintiff and Shaver occupied similar positions in the team, but Shaver was given additional tasks. Even if defendants did not assign those tasks to plaintiff because of a perceived disability, that alone is insufficient to establish that plaintiff was regarded as having a physical impairment that substantially limited her major life activities. Perception must mirror reality.

Indeed, courts hold that a perceived impairment must also be substantially limiting and significant. *Gordon*, 100 F.3d at 913; *Ellison*, 85 F.3d at 192; *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir. 1995); *Byrne v. Board of Education*, 979 F.2d 560, 564 (7th Cir. 1992). "[A] significant impairment is one that is viewed by the employer as generally foreclosing the type of employment

17

involved, not just a narrow range of job tasks." *Gordon*, 100 F.3d at 913 (citations omitted); *see also Forrisi v. Bowen*, 794 F.2d 931, 935 (4th Cir. 1986)("an employer regards an employee as [substantially limited] in his or her ability to work by finding the employee's impairment to foreclose generally the type of employment involved").

Defendants did not consider plaintiff's alleged disability as limiting "the type of employment involved." *Forrisi*, 794 F.2d at 935. Plaintiff testified at her deposition that "[m]ost of my jobs have been mind intensity [sic], ... they haven't been labor intensive." (Plaintiff's Deposition, at 27.) Plaintiff stated that she "assured [Colsa management] that ... the task that I was having to do was a mental task and it wasn't physical." (*Id.*, 57.) Plaintiff also told Judith Shaver "I am not a laborer and I am paid to think and there is nothing wrong with my brain." (Maples Deposition, Exhibit 13, Memorandum from plaintiff to Human Resource Director Diane Maples, at 2.) Thus, the undisputed evidence shows plaintiff's job position did not require physical exertion, only mental.

Defendants clearly did not regard plaintiff as unable to perform the "mental tasks" required in her job. At most, defendants considered plaintiff incapable of performing only "a narrow range of job tasks." *Gordon*, 100 F.3d at 913. That is not enough to establish that Colsa regarded plaintiff as having a physical impairment that substantially limited her major life activities.

18

Thus, plaintiff's ADA claims must be dismissed, because she cannot prove she has a "disability" as defined by the Act.

### III.  TITLE VII CLAIMS

Title VII "prohibits employment discrimination on the basis of gender, and seeks to remove arbitrary barriers to sexual equality at the workplace with respect to 'compensation, terms, conditions, or privileges of employment.'" *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1981)(citations omitted).  Plaintiff presents three claims under Title VII:  hostile work environment sexual harassment; sex discrimination; and retaliation.  Defendants move to dismiss each of those claims.

### A.  Individual Capacity Title VII Claims

The Eleventh Circuit clearly holds that Title VII relief is against the employer, not employees in their individual capacity. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1520 n.3 (11th Cir. 1995).  Therefore, supervisory employees, although agents of the employer, are not "employers" under Title VII.  *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).   Thus, plaintiff's Title VII claims against defendant Jose A. Collazo are due to be dismissed.

### B.  Sex Discrimination

The only act plaintiff alleges that could be construed as the basis for a claim of sex discrimination is, male Colsa employees (David Polk and Ken Riley) were allowed to fly to the San Francisco seminar from Huntsville, while she was required to fly from Birmingham.  Defendants presented the affidavit of Dianne Walker,

19

a representative of Sterling Travel Agency, who explained the reason for plaintiff's flight from Birmingham, rather than Huntsville.

> Attached to this affidavit as Exhibit "A" are copies of tickets issued for David Polk and Ken Riley to travel to San Francisco, California on September 18, 1995. These tickets were issued on August 25, 1995 at a special rate of $455.00 per person because the tickets were non-refundable and issued at least 21 days in advance of travel. Attached to this affidavit as Exhibit "B" is a Continental Airlines ticket for Bernadette Garrett-McCants to travel to San Francisco, California on September 18, 1995. This ticket was issued on September 7, 1995 at a rate of $622.00 because the ticket only qualified for a seven (7) day advanced notice discount. At the time of Ms. Garret-McCants' request, the fare to travel to San Francisco, California from Huntsville, Alabama was over $1,200 because discount tickets were no longer available.

(Diane Walker Affidavit, at 2.) Plaintiff totally failed to cast any doubt upon the credibility of that legitimate, non-discriminatory reason for requiring her to fly from Birmingham. Accordingly, plaintiff's Title VII sex discrimination claim is due to be dismissed.

## C. Retaliation

To establish a *prima facie* case of retaliation, plaintiff must show: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). Plaintiff cannot establish that Colsa took adverse employment action against her after she complained of Collazo's alleged harassment. The same day plaintiff filed a formal complaint with Colsa, she voluntarily resigned.

20

Thus, there is absolutely no basis for plaintiff's retaliation claim, and that claim also is due to be dismissed.

## D.  **Sexual Harassment**

Courts recognize two forms of sexual harassment: *quid pro quo* sexual harassment; and, hostile work environment sexual harassment. *Quid pro quo* sexual harassment occurs when an employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands. *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir. 1989), *reh'g denied*, 874 F.2d 821 (11th Cir. 1989). Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Steele*, 867 F.2d at 1315. Plaintiff argues she was subjected to hostile work environment sexual harassment, not *quid pro quo* sexual harassment. (Plaintiff's Brief, 20-22.)

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a)(3)(1981).[4]  The five elements of a *prima facie* Title VII claim for hostile work environment sexual

---

[4] In General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the Supreme Court suggested the degree to which courts should defer to the E.E.O.C.'s interpretation of Title VII: "[w]e consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance...." (citations omitted).

harassment are: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon the employee's sex; (4) the harassment complained of affected a "term, condition, or privilege" of employment, in that it was "sufficiently severe or pervasive to alter the condition of [the victim's] employment and create an abusive working environment"; and (5) the employer either knew, or should have known of the harassment, but failed to take prompt remedial action and, therefore, is liable under principles of *respondeat superior*. *Henson*, 682 F.2d at 903-905; *Martin v. Norfolk Southern Railway Company*, 926 F.Supp. 1044, 1050 (N.D. Ala. 1996). The crucial factors in this case are whether Collazo's conduct was sufficiently severe and pervasive to establish a Title VII violation, and, if it was, whether Colsa can be held liable for Collazo's conduct.

### 1. The Alleged Harassment Was Not Severe or Pervasive

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). In evaluating whether harassment is sufficiently severe or pervasive to bring it within Title VII's purview, courts must examine the totality of circumstances, including: "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

22

unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. at 371. After careful consideration of the entire record, this court concludes that the conduct of which plaintiff complains is neither sufficiently severe nor pervasive to create an environment that a reasonable person would find hostile or abusive.

Plaintiff does not allege she was touched in a sexual manner; therefore, this court's analysis focuses solely on the comments. Plaintiff can point to only four specific instances of verbal harassment during the 35 months she was supervised by Collazo. When the first incident occurred, she "hadn't been working with [Collazo] long." (Plaintiff's Deposition, at 95.) Plaintiff began working with Collazo in January of 1993. That incident involved Collazo's suggestion that they meet "in a dark room with a bottle of wine." (Id.) Plaintiff also claims Collazo complemented her legs, and made the comment "you know how I handle women." (*Id.*, 93.) The last, and most bizarre comments (the venereal disease analogy) occurred in September of 1995. No reasonable jury could conclude those four, isolated incidents, occurring over a 35 month period of time, were "pervasive," as that term is defined under Title VII. See *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987), *overruled on other grounds by Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2362, 105 L.Ed.2d 132 (1989)(to be deemed pervasive, the conduct must be more than episodic; it must be sufficiently continuous and concerted); *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir. 1983)(isolated incidents

23

generally will not be sufficient to create a hostile working environment); *Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir. 1995)("[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage"); *Weiss v. Coca-Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir. 1993)(relatively isolated incidences of non-severe conduct do not rise to the level of a hostile environment); *Christoforou v. Ryder Truck Rental,* 668 F.Supp. 294, 301 (S.D. N.Y. 1987)(although the level of behavior needed to create a hostile environment "cannot be precisely defined," it is "clearly more abusive, pervasive and persistent" than three specific incidents of sexual harassment over an 18 month period).

In addition, Collazo's comments were not sufficiently "severe," as that term is defined in Title VII law. In *Baskerville v. Culligan International Company,* 50 F.3d 428 (7th Cir. 1995), the harassing supervisor: called plaintiff "pretty girl"; made grunting noises when she wore a leather skirt; suggested that a broadcast over the public-address system required "All pretty girls [to] run around naked"; referred to all women as "tillies"; and made a gesture intended to suggest masturbation. *Id.* at 430. Chief Judge Posner, writing for the court, discussed "the line that separates merely vulgar and mildly offensive from deeply offensive and sexually harassing." *Id.* (quoting *Carr v. Allison Gas Turbine Division,* 32 F.3d 1007, 1010 (7th Cir. 1994)). The court concluded the harasser's conduct "was not in the area of uncertainty," in

24

concluding that "no reasonable jury could find that [the harasser's] remarks created a hostile working environment." *Id.*, at 431.

Collazo's conduct - even the truly strange venereal disease analogy - was no more offensive than that of the harasser in *Baskerville*. Therefore, this court concludes that no reasonable jury could find that his remarks would interfere with a reasonable person's work performance to the extent required by Title VII. As plaintiff's co-worker Lisa Miller aptly stated: "adults say things that are not always rated G, and they may just be poor taste as opposed to harassment." (Miller Deposition, at 48.)   Although Collazo's comments clearly were inappropriate, distasteful, and insensitive (among other adjectives), they do not give rise to a violation of Title VII.

### 2.   Colsa is not Liable under the Doctrine of Respondeat Superior

Under a pure hostile work environment sexual harassment claim, corporate liability "exists only through *respondeat superior*; liability exists where the corporate defendant knew or should have known of the harassment and failed to take prompt remedial action against the supervisor." *Steele*, 867 F.2d at 1316 (citations omitted). The effectiveness of Colsa's remedial actions cannot be properly measured because plaintiff quit before those remedial actions were taken. The Third Circuit discussed the impact on a summary judgment motion of a harassed employee's quitting before the effectiveness of the remedial action can be measured.

> [W]here the effectiveness of the prompt remedial action cannot be tested, courts may still decide that the action was adequate as a matter of law.  Hence, though [plaintiff's] decision to quit prevents us from determining whether [the employer's] remedial action was <u>effective</u>, the question before us is whether there is a genuine issue of material fact as to whether that action was <u>adequate</u>.

*Knabe v. The Boury Corporation*, __ F.3d. __, 1997 WL 282905, at *8 (3rd Cir. May 29, 1997)(emphasis supplied); *see also Steele*, 867 F.2d at 1316 (holding employer took prompt remedial action, even though the harassed employees quit less than two weeks later).  A comparison of Colsa's actions and those of the defendant in *Knabe* sheds light on the result required in this action.

The harasser in *Knabe* made several inappropriate comments to the plaintiff (e.g., asking her if she wore underwear and if she had sex with her fiancé before coming to work), and refused to schedule work for her.  Once the plaintiff complained, the employer investigated the claims and determined that no other employees had witnessed or heard the alleged harasser make any improper statements to plaintiff.  Therefore, the defendant's manager "decided not to <u>reprimand or otherwise sanction</u> [the alleged harasser], based on her (mistaken) belief that she could not make a finding that an employee had engaged in sexual harassment without corroborating testimony." *Knabe*, 1997 WL 282905, at * 2 (emphasis supplied).  Nevertheless, the employer: <u>warned the alleged harasser</u> that the "company does not tolerate any sexual comments or actions [and] ... violations of this policy will receive possible suspension and/or termination"; restored plaintiff to her prior position; and informed plaintiff that she should "contact the

26

company at any time regarding any improper language or sexual advances." *Id.*, at * 6. Plaintiff quit immediately after she was informed of those actions, because she felt they were inadequate. Despite plaintiff's resignation, the district court determined the employer's actions were reasonably calculated to end the harassment and granted summary judgment. The Third Circuit affirmed.

Colsa's actions, like those of the employer in *Knabe*, were reasonably calculated to end the harassment. When plaintiff complained to Maples on September 18, 1995, Maples immediately responded that she thought Collazo's conduct was inappropriate, and assured plaintiff that her allegations were serious and would be investigated. Once plaintiff filed a written complaint on September 25, 1995, Maples immediately began her investigation. Over the next week Maples interviewed Collazo and several of plaintiff's co-workers. On October 5, 1995, Maples completed her investigation and concluded Collazo should be reprimanded. On October 30, 1995, Collazo was issued a reprimand that required him to refrain from "making any statement/analogy of a sexual nature to a female employee" and to attend an employment law seminar, to sensitize him to gender issues.

Like the employer in *Knabe*, Maples interviewed the victim of the alleged harassment and other employees at the facility, and assured the victim that her complaint was considered serious. In addition, Maples went several steps further than the employer in *Knabe*: she concluded there had been misconduct by Collazo; she

27

issued a written reprimand; and she required that Collazo attend an employment law seminar.

The Eleventh Circuit considers it to be "[o]f special importance ... [if the] harassment ended after the remedial action." *Steele*, 867 F.2d at 1316. Although the effectiveness of Colsa's actions cannot be measured as to plaintiff, "plaintiff cannot survive summary judgment merely by failing to return to ... her job after the remedial action at issue is taken." *Knabe*, 1997 WL 282905, at *8. The record does not reflect that Collazo sexually harassed any other female employees after he received his written reprimand. Thus, Colsa's actions were both prompt and effective. See *Waymire v. Harris County, Texas*, 86 F.3d 424, 429 (5th Cir. 1996)(written reprimand placed in employee's permanent file was prompt remedial measure, "even with the three month delay").

Title VII requires the employer to do more in the way of "remedial measures" than merely request that the offensive employee refrain from discriminatory conduct in the future. *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 n.5 (1st Cir. 1980). However, "Title VII does not require an employer to use the most serious sanction available to punish the offender." *Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244, 144 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Thus, Colsa was not required to fire Collazo in light of the allegations. Rather, Colsa was required only to take steps "reasonably calculated to end the harassment." *Garcia v. Elf Atochem*, 28 F.3d 446, 451 (5th Cir. 1994). Colsa

28

complied with that requirement and, therefore, it is not liable for Collazo's actions under the doctrine of *respondeat superior*. Accordingly, plaintiff's hostile work environment sexual harassment claim is due to be dismissed.

### IV. CONSTRUCTIVE DISCHARGE

Plaintiff alleges she was constructively discharged because of her disability in violation of the ADA and/or because of Collazo's sexual harassment or sex discrimination in violation Title VII. That claim completely lacks evidentiary support.    The record unquestionably reveals that plaintiff's resignation was voluntary, and that she did not even give Colsa a chance to cure any problems in her working environment.    Also, the incidents that occurred before plaintiff resigned were neither sufficiently severe nor pervasive to compel a reasonable person to terminate her employment.

In any event, absent proof of the underlying sexual harassment or other statutory violation, there can be no constructive discharge predicated on that conduct.  *Barrett v. Omaha National Bank,* 726 F.2d 424, 428 (8th Cir. 1984)("[h]aving failed to prove her claims of sexual harassment ... Barrett has not established the underlying illegality necessary to support a constructive discharge claim"); *Vermett v. Hough,* 627 F. Supp. 587, 607-08, (W.D. Mich. 1986)(claim of constructive discharge "must of necessity fail" if there is no finding of sexual harassment); B. Lindemann and D. Kaude, *Sexual Harassment in Employment Law,* 255 n.11 (1995)(if the plaintiff fails to prove the underlying sexual harassment, there

29

can be no claim of constructive discharge predicated on the harassing conduct). Accordingly, plaintiff's claims of constructive discharge must fail.

### V. STATE LAW CLAIMS

Finally, plaintiff alleges several state law claims.[5] Federal jurisdiction over pendent state law claims is governed by 28 U.S.C. § 1367(a) which provides that:

> in any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Even so, "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). This court exercises such discretion and declines.

### VI. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is due to be granted, and this action dismissed. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _20th_ day of June, 1997.

_____
United States District Judge

---

[5] Plaintiff brings pendent state law claims against both defendants for invasion of privacy and outrage. Also, plaintiff brings a pendent state law claim for "negligent and/or wanton training, supervision, and retention" against defendant Colsa Corporation ("Colsa").